NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**SCENTSATIONAL TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**v.**

**PEPSICO, INC., PEPSI-COLA TECHNICAL OPERATIONS, INC., THE QUAKER OATS COMPANY, STOKELY-VAN CAMP, INC., TROPICANA PRODUCTS, INC.,**
*Defendants-Appellees*

---

2018-2091

---

Appeal from the United States District Court for the Southern District of New York in No. 1:13-cv-08645-KBF, Judge Katherine B. Forrest.

---

Decided: May 16, 2019

---

MELVIN C. GARNER, Leason Ellis LLP, White Plains, NY, argued for plaintiff-appellant. Also represented by LORI LEIGH COOPER, LAUREN BRETTE SABOL, CAMERON SEAN REUBER; JOEL B. ROTHMAN, Sriplaw PLLC, Boca Raton, FL.

RICHARD B. HARPER, Baker Botts, LLP, New York, NY,

argued for defendants-appellees. Also represented by JULIE BETH ALBERT, ROBERT LAWRENCE MAIER, JENNIFER COZEOLINO TEMPESTA.

————————————

Before PROST, *Chief Judge,* LOURIE and BRYSON, *Circuit Judges.*

PER CURIAM.

Appellant ScentSational Technologies LLC ("ST") filed this action against the defendants (collectively, "PepsiCo"), alleging misappropriation of trade secrets and breach of contract, and seeking correction of inventorship on a patent issued to PepsiCo. ST's claims arose from dealings ST had with PepsiCo in which ST contends that PepsiCo misappropriated ST's trade secrets to a process of adding aromas to beverage bottles in order to enhance the perceived taste of the beverage. ST argues that PepsiCo used the misappropriated trade secrets, in violation of non-disclosure agreements between the parties, so as to obtain patent rights to ST's technology.

ST's claim for damages is based on its separate negotiations with the Coca-Cola Company that ST expected would result in an agreement that would entail the commercialization of ST's technology in various beverages sold by the Coca-Cola Company. Those negotiations came to an end, according to ST, when Coca-Cola discovered that PepsiCo had filed a patent application on similar technology and for that reason decided not to pursue a commercialization agreement with ST. Before the district court, ST sought lost profits damages based on its estimate of the profits it would have earned from the prospective commercialization of the ST technology in Coca-Cola's products.

The district court granted summary judgment to PepsiCo. The court first struck much of ST's expert testimony as improper under the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Based in part

on its *Daubert* rulings, the court then granted summary judgment against ST on the issues of causation and damages, which resulted in the dismissal of ST's claims of trade secret misappropriation and breach of contract. Finally, the court granted summary judgment to PepsiCo on ST's claim of a right to correction of inventorship, on the ground that ST's evidence of inventorship was not sufficient to support its claim. ST then took this appeal.

1. ST's appeal is directed in large part to challenging the district court's *Daubert* rulings that struck much of ST's evidence of causation and damages. The Supreme Court has explained that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and for that reason, "a court of appeals is to apply an abuse-of-discretion standard" when it reviews a trial court's decision to admit or exclude expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see Gen. Elec. Co v. Joiner*, 522 U.S. 136, 142 (1997). In the Second Circuit, whose law we apply to this non-patent-law issue, a decision to exclude expert testimony is not an abuse of discretion unless it is "manifestly erroneous." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 160–61 (2d Cir. 2012) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).

The district court in this case engaged in an exceptionally detailed analysis of each of ST's experts' reports and each expert's claimed field of expertise before finding that certain portions of the proffered evidence would be admitted and other portions would not. We have reviewed the district court's analysis closely and are satisfied that the district court did not abuse the broad discretion it is accorded in determining whether, and to what extent, to admit particular expert testimony at trial.

2. In the absence of the proffered expert testimony on damages and causation, the district court concluded that

summary judgment was appropriate on those issues. In particular, the court held that ST's proffered evidence was insufficient to support its claim to lost profits based on the prospect that Coca-Cola would adopt its technology and commercialize products using that technology. We agree with the district court's conclusion, for essentially the reasons given by the court.

3. In the course of its briefs, ST makes passing references to other theories of recovery on its trade secret misappropriation and breach of contract claims. One theory is that ST was entitled at least to damages related to the completion of "Phase 2" of the development project with Coca-Cola, which Coca-Cola terminated, allegedly when it learned of PepsiCo's patent application. A second theory is that ST was entitled to at least an award of nominal damages, and therefore summary judgment should not have been granted extinguishing ST's causes of action for trade secret misappropriation and breach of contract. The record, however, does not justify reversal of the judgment as applied to either of those theories.

Before the trial court, the plaintiff's argument on damages in opposition to summary judgment was focused entirely on lost profits—in particular the lost profits from potential commercialization of ST's proprietary technology. ST addressed the issue of funds for Phase 2 of the development project in a single short passage in its brief in opposition to summary judgment. That passage reads as follows: "On September 15, 2011, ST sent Coke an updated Phase 2 statement of work. . . . This version stated that the development cost for Phase 2 was [various sums for particular work] . . . . This is additional development money that ST lost." That passage is found in a section of the plaintiff's brief that addresses "reasonably expected profits."

In the section of her order on summary judgment dealing with the infirmities of the plaintiff's showing on lost

profit damages, the trial judge did not specifically address the one sentence in which the plaintiff referred to the "additional development money that ST lost." The plaintiff did not seek reconsideration on the ground that the court had overlooked the claim to damages based on the loss of funds from Phase 2 of the development project.

The evidence in the record regarding ST's theory of recovery for Phase 2 of the development project work is thin. Although Coca-Cola and ST never executed an agreement to proceed with Phase 2, Coca-Cola paid ST a modest amount for work that ST performed after the completion of Phase 1 and before the cancellation of the project. That evidence, however, does not indicate that Coca-Cola had signed on to ST's proposal for Phase 2 or would have agreed to ST's proposed payment terms for that part of the development project.

ST introduced a draft statement of work for Phase 2 that it prepared, but there is no evidence that Coca-Cola agreed to either the statement of work or the proposed fee. Moreover, ST proffered no evidence as to what its costs would have been for the work on Phase 2, from which its potential profits on that part of the development project could be calculated.

Finally, ST relies on an email from a Coca-Cola official after the completion of Phase 1 of the development project saying "I am looking forward to some breakthrough work," as evidence that Coca-Cola was committed at that time to proceeding with Phase 2 of the project. That remark, however, falls far short of an agreement on Coca-Cola's part to proceed with Phase 2 of the project, much less to do so on the terms subsequently set forth in ST's proposed statement of work.

In its brief on appeal, ST made only passing mention of the development fees as a component of its damages claim. ST wrote: "Even without ST's lost profits analysis, it could still prove damages based on other factors, such as (i) a

modified version of ST's lost profits analysis using different volume, cost, or pricing numbers, (ii) *ST's lost development fees from Coke*, or (iii) the company valuation theory presented by Pepsi's damages expert, Mr. Imburgia, i.e., that Coke would not pay more for [the aroma project] than it would to buy ST . . . ." ScentSational Br. 44 [emphasis added]. ST's reply brief also contains only a single sentence addressing this issue: "At a minimum, ST lost the full revenue from its Phase 2 development agreement." ScentSational Reply Br. 13.

Even assuming that the cursory references to the Phase 2 development fees in the district court and in this court are sufficient to preserve ST's claim to that component of damages, the evidence to which ST points is not sufficient to support reversal of the district court's summary judgment order. In particular, the evidence fails to show that Coca-Cola would have agreed to the statement of work and the fees for that work proposed by ST, and it fails to show what portion of those proposed fees would have constituted profits for ST, given that ST would have incurred at least some costs in performing that work.

As for nominal damages, ST's brief on appeal makes two passing references to nominal damages, one in the section of the brief on its inventorship claim, and the other in the section directed to its breach of contract claim. In its district court brief opposing summary judgment, ST made no reference at all to nominal damages. That claim was therefore waived by not having been raised before the district court. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997). In any event, we have held that we will ordinarily not remand a case merely to determine whether nominal damages would have been appropriate. *Northrop Grumman Computing Sys., Inc. v. United States*, 823 F.3d 1364, 1368 n.2 (Fed. Cir. 2016).

4. The district court held that ST had failed to produce sufficient evidence to support its claim that its principal,

Steven Landau, was "at least a joint inventor" of the patent that was issued to PepsiCo in 2013. The court noted that ST had merely compared its allegations regarding one of its trade secrets with the language in PepsiCo's patent, which the court held was insufficient to support a correction of inventorship claim. That was especially so, the court stated, because "evidence demonstrate[d] that ST drafted its trade secrets after Pepsi had applied for its patents (and during this litigation)." The court added that there was "no deposition testimony from Mr. Landau . . . indicating the specific circumstances of his inventorship, let alone any documentary evidence."

In order to establish a right to correction of inventorship on a co-inventorship theory, a party must prove co-inventorship by facts supported by clear and convincing evidence. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998). To satisfy that burden, the alleged co-inventor must prove his contribution to the conception of the invention by more than his own testimony concerning the relevant facts. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004). The requisite reliable corroborating evidence "preferably comes in the form of records made contemporaneously with the inventive process." *Id.*

In its opposition to the motion for summary judgment, ST relied on Mr. Landau's description of his trade secrets and a comparison between that description and one of the claims of PepsiCo's patent.[1] The Landau declaration on

---

[1] In its briefs before this Court, ST refers to several of its trade secrets in support of its inventorship claim. In its opposition to summary judgment before the district court, however, ST's argument on correction of inventorship referred only to what ST refers to as the "secondary cover" trade secret. Our analysis is therefore limited to that trade secret.

which ST relied provided a description of that trade secret. The declaration thus provided evidence of the existence of the trade secret, but it did not point the district court to corroborating evidence relating to the inventive process itself sufficient to support Mr. Landau's asserted contribution to the conception of the claimed invention.

On appeal, ST frames its correction of inventorship claim as equivalent to its trade secret misappropriation claim. ST states that "[t]he evidence supporting ST's claim of misappropriation relating to [PepsiCo's patent] goes hand-in-hand with its correction of inventorship claim; one necessarily proves the other." ScentSational Br. 46. ST then argues that correction of inventorship could be awarded as an equitable remedy for misappropriation of trade secrets. *See id.* ("Even if ST was denied lost profits [for trade secret misappropriation], a jury could still award it an equitable remedy, correction of inventorship . . . ."). That argument, however, was not raised before the district court, and it was therefore waived for purposes of appeal. In any event, even if that argument had been raised below, it fails to provide the necessary corroboration for Mr. Landau's assertion that he conceived of the secondary cover trade secret claim.

In light of the insufficiency of ST's showing in response to PepsiCo's summary judgment motion, the district court did not err in granting the motion with regard to the inventorship issue.

**AFFIRMED**