36 F.Supp.2d 1166 (1999)
Ronald S. DEICHMANN and Usher's Waterworks, Inc., Plaintiffs,
v.
The BOEING COMPANY, Defendant.
No. 4:97CV1913-SNL.
United States District Court, E.D. Missouri, Eastern Division.
March 3, 1999.
*1167 Henry W. Cummings, Henry W. Cummings, St. Charles, MO, for plaintiffs.
Robert G. Lancaster, Associate, David A. Roodman, Associate, Daniel A. Crowe, Associate, Bryan Cave L.L.P., St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
LIMBAUGH, District Judge.
This matter is before the Court on Defendant Boeing's Motion for Summary Judgment (# 81) filed February 10, 1999, as part of a Motion Package pursuant to Local Rule 4.05. This Court previously dismissed Counts II and IV of plaintiffs' Third Amended Complaint for failure to state a claim upon which relief could be granted. This motion seeks summary judgment on the remaining Counts I and III. Count I claims breach of an express contract. Count III states a federal statutory claim for correction of inventorship.

Summary Judgment Standard
Courts have repeatedly recognized that summary judgment, like dismissal, is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Assoc. Elec. Coop., Inc., 838 F.2d *1168 268, 273 (8th Cir.1988). But there must be absolutely "no genuine issue as to a material fact and the moving party [must be] entitled to judgment as a matter of law." Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962).
The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court will now turn to the facts.

Undisputed Facts
As an initial matter, the Court deems admitted all the facts as outlined by defendant. Local Rule 4.01(E) states that the following:
Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.
Plaintiffs failed to identify the paragraph numbers from defendant's statement of The Uncontroverted Facts for any issues which they contend are in dispute. Rather, plaintiffs identify certain facts which they believe a jury could find which would result, they argue, in a verdict in their favor. However, "[a] district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) (quoting White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir.1990)). Once defendant met its burden of demonstrating a lack of genuine issues of material fact, plaintiffs were required to designate specific facts creating a triable controversy. Plaintiffs' mere allegations that issues remain in dispute are insufficient to meet the requirements of Local Rule 4.01(E), and they are deemed to have admitted all facts which were not specifically controverted. See Ruby v. Springfield R-12 Pub. Sch. Dist., 76 F.3d 909, 911 n. 6 (8th Cir.1996). The Court will now outline the facts identified by defendant.
Since 1973, McDonnell Douglas Corporation (MDC)[1] has designed, manufactured and used Automated Ultrasonic Scanning Systems (AUSS) to non-destructively inspect airplane parts for structural flaws. Defense Exhibit 1. While this originally required submerging the entire part in a tank of water, the current state of the art involves emitting an ultrasonic wave through a stream of water which can be moved slowly over the surface of the part being tested. See Defense Exhibit 13, United States Patent 5,431,342 (the '342 patent). Prior to 1989, MDC used ordinary nozzles to produce the necessary stream of water. However, MDC found that a stream of water emitted from an ordinary nozzle quickly becomes non-laminar or diffused. Id. As a result, it was necessary to keep the testing device very close to the part being tested. Id. This posed difficulty in the testing of oddly-shaped parts. Id. For that reason, *1169 MDC began contemplating the use of nozzles capable of producing a more laminar or coherent flow.
Sometime prior to 1989, designers of ornamental fountains began using laminar flow nozzles in their displays. On July 2, 1987, California fountain designer Mark Fuller applied for a patent on a laminar flow nozzle. Defense Exhibit 8, United States Patent 4,795,092 (the Fuller patent). That patent application described a nozzle utilizing a "cylindrical enclosure ... having ... a substantially sharp edge [outlet] orifice," and a "turbulence reducing means compris[ing] an open cell foam member...." Id.[2] On January 3, 1989, that patent numbered 4,795,092 issued. Id.
In July, 1989, MDC's AUSS engineers learned that plaintiff Usher's Waterworks, Inc. (Usher's), a St. Louis area fountain design firm, used laminar flow nozzles for ornamental fountains. Rich Lawson of MDC contacted Usher's to determine whether or not technology in the fountain nozzles would be adaptable for ultrasonic testing systems. Prior to this contact, no one connected with Usher's had any experience with ultrasonic testing applications or the use of laminar nozzles in such applications. Deichmann Deposition p. 69 ln. 16; Kuykendal Deposition pp. 127-28.
David Usher, who worked for Usher's at that time, claimed that they in fact possessed the technology to produce a long and extremely coherent stream of water. Usher Deposition p. 49 ln. 20. Plaintiffs agreed to demonstrate this technology for MDC representatives immediately. Id. at lns. 23-24. However, prior to this demonstration, plaintiffs insisted that MDC enter a non-disclosure agreement (the Non-Disclosure Agreement) to protect plaintiffs' assertedly confidential information. Defense Exhibit 3. The agreement defined confidential information as "all information both written, oral, and as represented by viewing the external and internal mechanisms of the nozzle(s), which [Usher's] deem[s] to be confidential and proprietary, relating to the coherent flow nozzle (including, but not limited to mechanical operation, data, know-how, technical and non-technical materials, parts, and specifications"). Id. The agreement required MDC to maintain such information in confidence and prevented MDC from engaging in any communication with any third parties regarding the information for five years. Id.
Representatives of both MDC and Usher's signed the Non-Disclosure Agreement, and Usher's demonstrated a laminar flow nozzle at their Fenton facility. Deichmann Deposition p. 137 ln. 16  p. 139 ln. 18. Apparently MDC was impressed enough with plaintiffs' nozzle that it ordered production by plaintiffs of a prototype coherent flow ultrasonic nozzle. Defense Exhibit 9. In exchange for the prototype nozzle, MDC agreed to pay Usher's $18,500.00. Id.
In March or April, 1990, plaintiffs advised MDC that they had completed a prototype nozzle which was available for demonstration at MDC's facility. Unfortunately, MDC was unhappy with the results achieved at the testing of the prototype. Lawson Deposition p. 34 ln. 12. The prototype nozzle that plaintiffs brought to MDC for testing apparently produced a laminar stream without MDC's additional requirements applied. Lawson Deposition p. 37 lns. 8-9. However, when the transducer was installed and the device placed in motion, the results were not satisfactory. Lawson Deposition p. 35 lns. 6-7; Usher Deposition p. 137 lns. 10-19. MDC informed plaintiffs the prototype nozzle yielded unusable data. Deichmann Deposition p. 157 lns. 21-22; p. 159 24. When Usher's personnel left MDC that day, they took the prototype nozzle with them. Deichmann Deposition p. 160 ln. 9. As Usher's had never provided any drawings, blueprints or schematics, this effectively ended the working relationship between Usher's and MDC. Deichmann Deposition p. 161 lns. 2-8.
MDC's development of laminar flow nozzle technology for application in ultrasonic testing *1170 did not end with the failure of plaintiffs' prototype. In March of 1991, Rich Lawson contacted another MDC engineer, Kondala Saripalli, regarding the AUSS nozzles. A group of MDC engineers including Saripalli, David Parekh and others began working on the problem. This group ultimately designed a successful prototype nozzle which produced a laminar stream without the ultrasonic transducer interference previously experienced.
On December 3, 1992, MDC applied for a patent on this nozzle, claiming (1) the introduction of water into a side-flow entry plenum chamber which results in the radial and uniform entry of water through a porous medium along the entire length and circumference of the main nozzle plenum chamber; and (2) the use of an angled knife-edge orifice plate which causes ultrasonic waves to reflect towards the porous membrane instead of being reflected back at the ultrasonic transducer. Defense Exhibit 13. On July 11, 1995, the '342 patent was issued for this nozzle, listing Kondala Saripalli, Eugene Myers, and Richard Lawson as inventors. On September 15, 1997, plaintiffs filed this lawsuit.

Discussion

I. Count I: Breach of Non-Disclosure Agreement
Count I of plaintiffs' Third Amended Complaint states a simple breach of contract claim.[3] Plaintiffs allege that Usher's and MDC entered a contract regarding the disclosure of information surrounding the nozzle in controversy here.[4] Both sides provided valuable consideration:
Usher's agreed to demonstrate a laminar flow nozzle and MDC agreed not to disclose any confidential information it received. The terms of the contract were written and both parties signed the agreement. In a contract case, summary judgment is appropriate where, as here, the language of the contract is clear and unambiguous and the meaning of the portion of the contract in issue is so apparent that it may be determined from the four corners of the document. See Betz v. Fagan, 962 S.W.2d 432, 436 (Mo.App.1998).
Plaintiffs allege that they kept their end of the bargain by demonstrating for MDC's agents a laminar flow nozzle at Usher's facility in Fenton, Missouri. They allege MDC breached the contract by disclosing confidential information. Specifically, plaintiffs' Third Amended Complaint alleges that defendant disclosed to certain third-parties information regarding "the concept of introducing water in a radial direction inwardly in a cylindrical plenum chamber through a porous wall of permeable material and then to allow the water to exit through a knife-edged orifice in which the angle of the orifice was of the order of 30 degrees...." Plaintiffs' Third Amended Complaint, Factual Allegations ¶ 9; Count I ¶ 1.
Plaintiffs' claim of breach by defendant has no merit. The language of the contract, drafted by plaintiffs, clearly and specifically excludes from coverage any information that defendant could demonstrate was "at the time of disclosure or thereafter [became] public knowledge through no fault or omission of [MDC]." Defense Exhibit 3 ¶ 5(b). It is undisputed that on January 3, 1989, the United States Patent Office issued to Mark Fuller of Studio City, California, a patent for a Laminar Flow Nozzle. That nozzle utilized a "cylindrical enclosure ... having ... a substantially sharp edge [outlet] orifice," and a "turbulence reducing means compris[ing] an open cell foam member...." Defense Exhibit 8. Plaintiffs' witnesses all admitted in their depositions that these are essentially the concepts plaintiffs alleged constituted confidential information.
*1171 Patented information falls squarely under the contractual language "public knowledge." This particular patent was public knowledge at the time of the alleged disclosure in controversy here. Therefore, the Court concludes that defendant did not breach the non-disclosure contract as alleged by plaintiffs. Defendant is therefore entitled to judgment as a matter of law.

II. Count III: Correction of Inventorship
Count III is a claim for correction of inventorship under 35 U.S.C. § 256.[5] That count seeks to add Mr. Ronald S. Deichmann as co-inventor of U.S. Patent 5,431,342, and to name plaintiff Usher's Waterworks as part owner of the patent.
"The patent laws provide that whoever `invents' patentable subject matter is entitled to a patent thereon, 35 U.S.C. § 101, and that when an `invention' is `made by two or more persons jointly they shall apply for [a] patent jointly.' 35 U.S.C. § 116 (1994)." Hess v. Advanced Cardiovascular Sys., 106 F.3d 976, 979 (Fed.Cir.1997). "Section 256 provides that if `through [inadvertent] error an inventor is not named in an issued patent ... the Commissioner [of Patents] may ... issue a certificate correcting such error,' and that `[the] court ... may order correction of the patent ... and the Commissioner shall issue a certificate accordingly.'" Id.
Inventorship is a question of law. Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460 (Fed.Cir.1998). Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention. Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227-28 (Fed.Cir. 1994). "Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Ethicon, 135 F.3d at 1460 (quoting Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed.Cir.1986) (internal citation omitted)). An idea is sufficiently "definite and permanent" when "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." Burroughs Wellcome, 40 F.3d at 1228.
"The conceived invention must include every feature of the subject matter claimed in the patent." Ethicon, 135 F.3d at 1460 (citing Sewall v. Walters, 21 F.3d 411, 415 (Fed.Cir.1994)). Nevertheless, for the conception of a joint invention, each of the joint inventors need not make the same type or amount of contribution to the invention. 35 U.S.C. § 116. "On the other hand, one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention." Ethicon, 135 F.3d at 1460. One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed contribution as a whole does not qualify as a joint inventor. Id., 135 F.3d at 1460 (citing Hess, 106 F.3d at 981).
The Federal Circuit recently summed up the three elements which constitute joint inventorship. A joint inventor must (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art. Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed.Cir.1998).
In order to succeed in this claim, the plaintiffs must be able to prove their contribution to the conception of the claims by clear and convincing evidence. See Ethicon, 135 F.3d at 1461. A claim of co-inventorship cannot rest merely on the plaintiff's testimony respecting the facts surrounding a claim of derivation or priority of invention. Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1474 (Fed.Cir.1997). Without corroborating evidence, such as contemporaneous documents *1172 prepared by a putative inventor, circumstantial evidence about the inventive process or oral testimony by some third-party, a plaintiff in an action of this sort simply cannot meet the clear and convincing standard. Ethicon, 135 F.3d at 1461.
This rule rests on important policy considerations. "[T]he temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply to great to permit a lower standard." Hess, 106 F.3d at 980 (quoting Amax Fly Ash Corp. v. United States, 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (Cl.Ct.1975)). "This language is similarly applicable to claims of co-inventorship made after a patent has been issued  particularly where, as here, the patent has been outstanding for a considerable time and the patented device has been successful. In that situation, too, there is an equally strong temptation for persons who consulted with the inventor and provided him with materials and advice, to reconstruct, so as to further their own position, the extent of their contribution to the conception of the invention." Hess, 106 F.3d at 980. In such a situation, the Court must insist that plaintiffs be able to prove their case by a very high standard of proof.
Plaintiffs have not once disputed that MDC first approached them with the concept of applying existing fountain nozzle technology in the non-destructive, ultrasonic testing field. Plaintiffs may be able to establish that they recommended certain existing nozzle technology which ultimately proved useful to MDC's engineers. However, there is absolutely no evidence currently in the record that plaintiffs contributed in any significant manner to the conception of the invention, made a significant contribution to the patented idea or ever did anything more than merely explain to MDC personnel the then current state of the art. See Pannu, 155 F.3d at 1351.
Plaintiffs contend that their conceptual contribution was "[i]ntroducing water through a porous wall of permeable material, and then to allow the water to exit from a knife edged orifice in which the angle of the orifice was of the order of 30 degrees. Plenum chamber is cylindrical, and non-tapered." Answer to Interrogatory No. 6. Plaintiff Deichmann stated in his deposition that the confidential material he disclosed to MDC included only the cylindrical shape, the use of a foam diffuser material, and the knife edge orifice. Deichmann Deposition pp. 173-74. It is clear that all of those elements were known in the prior art. In fact, Mark Fuller, an individual not a party in this lawsuit, had discussed each and every one of those concepts in a patent issued before MDC ever contacted plaintiffs.
In their Memorandum in Support of Plaintiffs' Opposition, plaintiffs attempt to present a somewhat different argument than that stated in their Third Amended Complaint. Plaintiffs argue not that they invented the concepts erroneously claimed as confidential information in the complaint, but rather that they conceived of applying those concepts in the ultrasonic testing environment. This argument is totally inconsistent with the factual allegations section of plaintiffs' Third Amended Complaint as well as the Facts section of the same memorandum in which they bring this argument for the first time. This argument is further belied by plaintiff Deichmann's testimony that prior to MDC's contacting Usher's, no one at Usher's had any knowledge or experience in the ultrasonic testing field.
It is undisputed that MDC personnel first conceived of the idea of applying ornamental fountain technology in the ultrasonic testing field. This explains the initial phone call to Usher's, a local firm engaged in the design and manufacture of ornamental fountains. All Usher's did after that was demonstrate the use of an existing nozzle design. The particular design characteristics of that nozzle were virtually identical to those described in Fuller's patent. Explaining existing art is not co-inventorship.
Not only did MDC first contact Usher's, but they also refused to disclose to plaintiffs any extraneous information beyond what Usher's would need to know in order to adapt the existing nozzle to MDC's specifications. See Usher Deposition p. 87 lns. 4-18. This further demonstrates that plaintiffs' contribution amounted to nothing more than supplying existing art. It may be that the nozzle ultimately designed by MDC's engineers *1173 incorporated many of the same principles as the failure prototype produced by Usher's. However, as those principles were undisputedly general knowledge in the ornamental fountain industry, this supply of existing art cannot form the basis of a claim of co-inventorship.
The Court finds that plaintiffs have simply failed to allege facts sufficient to create an issue as to whether they were sufficiently involved in the conceptualization of the final and definite idea described in the patent at issue here. Even if the testimony of Deichmann and the other Usher's employees who gave depositions in this case could create such an issue, plaintiffs have provided no contemporaneous documentation that they invented these concepts. Apparently plaintiffs provided no schematics or drawings to MDC at the time of their negotiations. Plaintiffs ultimately kept the only prototype nozzle ever produced. With no documentation, nor any other evidence whatsoever that they conceived the idea for the patent at issue, plaintiffs could never prove their claim to a jury by clear and convincing evidence. Accordingly, defendant is entitled to judgment as a matter of law on both inventorship and ownership of the '342 patent.

Conclusion
Plaintiffs' fail to state a viable claim of breach of contract. Their Third Amended Complaint identifies very specifically the information they considered confidential, and which plaintiffs allege MDC wrongfully disclosed. However, defendant has established beyond any issue whatsoever that plaintiffs' claimed confidential information was public knowledge before the rocky relationship between these parties even began. The contractual language drafted by plaintiffs themselves unambiguously excluded such information from coverage by the Non-Disclosure Agreement.
Plaintiffs' argument for correction of inventorship is similarly doomed by the undisputed facts. Plaintiffs admit that the concepts they claim as original in their complaint were actually patented by Mark Fuller before MDC ever contacted them. They attempt to salvage their claim by arguing that it was their idea to apply fountain technology in the ultrasonic testing environment. But this argument is wholly inconsistent with the undisputed fact that MDC contacted plaintiffs first with the express intention of learning state-of-the-art fountain technology for use in ultrasonic testing. Plaintiffs' incredible argument is further weakened by their admission that prior to their involvement with MDC they had no knowledge or experience in the ultrasonic testing field. A claim of co-inventorship cannot arise from the mere explanation of existing art to a party who wishes to apply that art in a different field. It is clear beyond dispute that that is what happened here. Therefore, summary judgment for defendant is correct in this case.
IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendant's Motion for Summary Judgment (# 81) is GRANTED.
IT IS FURTHER ORDERED that this case is DISMISSED with prejudice.
NOTES
[1] Since the events in controversy occurred, MDC has been acquired by defendant Boeing.
[2] In the Fuller nozzle, water was introduced in a tangential direction. The concept plaintiffs claim involves the introduction of water in a radial direction. However, the Court believes this difference does not constitute an unobvious, original design as the Fuller patent discusses the introduction of water in a radial direction as used in the prior art. The Fuller patent rejects radial injection in favor of tangential injection.
[3] The Non-Disclosure Agreement included a clause selecting the law of Missouri as the controlling law. Since the parties do not dispute the enforceability of that choice of law clause, the Court will apply Missouri law to this contract.
[4] In their Memorandum in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, plaintiffs allege various illegal actions by defendant including violation of Missouri's version of the Uniform Trade Secrets Act, Mo. Rev.Stat. § 417.450 et seq., misappropriation of trade secrets, and breach of fiduciary duty. However, no allegations of these sorts are anywhere to be found in Count I of the Third Amended Complaint. Accordingly, any such arguments are completely irrelevant to this motion.
[5] Again, their Memorandum in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment strays incredibly far afield from the scope of plaintiffs' complaint. The complaint alleges that plaintiff Ronald E. Deichmann should be added to the patent in issue as a co-inventor. In their Memorandum, plaintiffs argue for the addition of David Usher as well. David Usher is not even a party in this lawsuit.