MASSACHUSETTS EYE AND EAR
INFIRMARY, Plaintiff

v.

NOVARTIS OPHTHALMICS, INC.
and QLT, Inc., Defendants

QLT, Inc., Counterclaimant

v.

Massachusetts Eye and Ear Infirmary,
Evangelos S. Gragoudas, M.D., and
Joan W. Miller, M.D., Counterdefen-
dants.

The General Hospital Corporation,
Intervenor

v.

Massachusetts Eye and Ear Infirmary,
Evangelos S. Gragoudas, M.D., and
Joan W. Miller, M.D., Defendants to
Intervenor's Complaint.

No. CIV.A. 01–10747–EFH.

United States District Court,
D. Massachusetts.

Jan. 25, 2005.

See also 345 F.Supp.2d 133.

Anthony A. Pastor, Fish & Neave, Bindu Donovan, Fish & Neave LLP, New York, NY, Christine M. Roach, Roach & Carpenter, P.C., Boston, MA, Christopher J. Harnett, Fish & Neave LLP, New York, NY, Gerald J. Flattmann, Fish & Neave, New York, NY, James F. Haley, Jr., Fish & Neave LLP, New York, NY, Karen Mangasarian, Fish & Neave, Kenneth B. Herman, Fish & Neave LLP, Krista M. Rygroft, Fish & Neave, New York, NY, for Plaintiff Massachusetts Eye and Ear Infirmary.

Adam R. Gahtan, Denise D. Taliaferro, Dimitrios T. Drivas, James S. Trainor, Jeffrey J. Oelke, White & Case, LLP, New York, NY, Juliet A. Davidson, Julie E. Green, Todd & Weld, LLP, Boston, MA, for Defendant Novartis Ophthalmics, Inc.

Barbara A. Fiacco, Denise W. DeFranco, Donald R. Ware, Mark A Reilly, Sarah E. Cooleybeck, Foley Hoag LLP, Boston, MA, for Defendant QLT, Inc.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

## I. *Introduction*

This is a patent infringement case involving a type of laser treatment for patients suffering from certain eye diseases. Defendant QLT, Inc. ("QLT") brought the instant summary judgment motion, arguing that pursuant to 35 U.S.C. § 256 the Court should correct inventorship of United States Patent No. 6,225,303 (the "'303 patent"). Because the Court rules that QLT's researcher, Dr. Julia Levy, significantly contributed to the upper end of the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range claimed in the '303 patent, the Court grants in part QLT's Motion to Correct Inventorship.[1]

## II. *Background*

Plaintiff Massachusetts Eye and Ear Infirmary ("MEEI") brought this suit alleging that Defendants QLT, Inc. and Novartis Ophthalmics, Inc. ("Novartis") infringed the '303 patent by manufacturing, using, selling, and marketing Visudyne for use in ocular therapy. In its answer, QLT raised twelve affirmative defenses and asserted seven counterclaims. One of those counterclaims, correction of inventorship, is the subject of the instant summary judgment motion.

The '303 patent, entitled "Use of Green Porphyrins to Treat Neovasculature in the Eye," claims methods for treating choroidal neovascularization and age-related macular degeneration using photodynamic therapy. The choroid is a vascular layer underlying the retina in the eye. Choroidal neovascularization refers to the proliferation of unwanted new blood vessels in the choroid, which can result in a form of age-related macular degeneration.

---

1. QLT jointly brought this motion to correct inventorship along with Intervenor The General Hospital Corporation ("MGH"). Today's decision does not address MGH's correction of inventorship claim. The sole effect of this Memorandum and Order is to add QLT's Dr. Levy as a co-inventor to the '303 patent. Though the Court finds merit in MGH's arguments, it shall not rule at this time on whether it should also add MGH's researchers as co-inventors.

Photodynamic therapy is a procedure involving the administration of a photosensitive drug (called a "photosensitizer" or "dye") into the bloodstream, accumulation of the drug in the target tissue, and activation of the drug by light, causing photochemical destruction of the target tissue. Green porphyrin dyes include a class of photosensitive drugs called benzoporphyrin derivatives ("BPD"), which are produced under license by Defendant QLT. One particular type of BPD, known as BPD–MA or verteporfin, is sold by QLT's marketing partner and licensee, Defendant Novartis, under the trademark "Visudyne." Photodynamic therapy involves the use of a low-intensity laser that shines light upon, or "irradiates," the eye. "Irradiance," which is measured in milliwatts per centimeter squared, is a technical term used in connection with lasers that refers to the intensity of laser light delivered to the target area.

Irradiance lies at the heart of this dispute because the '303 patent is inventive over United States Patent No. 5,798,349 (the "'349 patent") only because the '303 patent claims an irradiance range that results in a "shortened treatment time." Both the '303 patent and the '349 patent issued from the same ultimate parent application, United States Application Serial No. 08/209,473 (the "'473 application"). All of the researchers involved in this lawsuit are named inventors on the '349 patent: Dr. Julia Levy of QLT, Dr. Joan Miller and Dr. Evangelos Gragoudas of MEEI, and Dr. Tayyaba Hasan and Dr. Ursula Schmidt–Erfurth of Intervenor The General Hospital Corporation ("MGH"). In contrast, only Dr. Miller and Dr. Gragoudas of MEEI are named inventors of

the '303 patent. Furthermore, both patents are entitled "Use of Green Porphyrins to Treat Neovasculature in the Eye," both have virtually identical specifications, and both patents have substantially similar claims.

The only meaningful difference between the '303 patent and the earlier-issued '349 patent is that independent claims 1 and 9 of the '303 patent set forth an irradiance range of 300 mW/cm$^2$ to 900 mW/cm$^2$ that results in a "shortened treatment time," whereas the '349 patent does not claim a specific irradiance range. Indeed, the United States Patent and Trademark Office ("PTO") initially rejected on obvious-type double patenting grounds United States Application Serial No. 09/347,382 (the "'382 application"), a continuation application claiming priority through the '349 patent that eventually issued as the '303 patent. According to the PTO, the '382 application was not inventive over the '349 patent because the claims of the '349 patent already covered the irradiance range claimed in the '382 application, namely, 300 mW/cm$^2$ to 900 mW/cm$^2$. In response, MEEI pointed out that in reaching its decision the PTO had not looked solely to the claims of the '349 patent, but had improperly relied on the '349 patent's specification.[2] MEEI explained that the claims of the '349 patent made no reference to the irradiance of the laser light or to the length of treatment time. In turn, the PTO suggested that MEEI could avoid double patenting by adding the phrase "in a shortened treatment time" to pending claims 21 and 29 of the '382 application, both of which claims set forth the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range. MEEI accepted this change, and it amend-

---

**2.** The '349 specification states: "The irradiance typically varies from about 150–900 mW/cm$^2$, with the range between about 150–600 mW/cm$^2$ being preferred. However, the use of higher irradiances may be selected as effective and having the advantage of shortening treatment time."

ed claims 21 and 29, which issued as independent claims 1 and 9 of the '303 patent.

The collaboration that resulted in the issuance of both the '303 and '349 patents began in the late 1980s and early 1990s when researchers from QLT, MEEI, and MGH variously began collaborating on projects involving photodynamic therapy and green porphyrins. This collaboration involved Dr. Julia Levy of QLT, Dr. Joan Miller and Dr. Evangelos Gragoudas of MEEI, and Dr. Tayyaba Hasan, Dr. Ursula Schmidt–Erfurth, and Dr. Reginald Birngruber of MGH. The collaboration spanned many years and the parties dispute the contributions each made to certain inventions. Thus, the Court will recount only those portions of the collaboration necessary to decide this motion: the 1992 experiments performed by MEEI's Dr. Miller and the 1993 experiments in which Dr. Miller collaborated with QLT's Dr. Levy. Both the 1992 and 1993 experiments were conducted before the March 14, 1994 filing of the '473 application, the ultimate parent application of both the '303 and '349 patents.

The following summary of the 1992 and 1993 experiments is derived from QLT's Local Rule 56.1 Statement of Undisputed Facts ("Statement of Undisputed Facts") and MEEI's response thereto. In 1992, Dr. Miller and Dr. Gragoudas, along with other researchers, became involved in two sets of experiments using photodynamic therapy on monkeys. Dr. Miller and Dr. Gragoudas designed the first set of experiments, which were then conducted by Dr. Miller. These experiments consisted of performing photodynamic therapy on mon-

keys with normal choroidal vessels at irradiances of 300 mW/cm$^2$, 600 mW/cm$^2$, 1200 mW/cm$^2$, and 1800 mW/cm$^2$. Thereafter, in the same year, Dr. Miller and Dr. Gragoudas, along with other researchers, coauthored an abstract reporting the results of a second set of experiments in which photodynamic therapy was performed on monkeys with choroidal neovascularization at an irradiance of 150 mW/cm$^2$.

The following year, in 1993, QLT contracted with Dr. Miller to perform photodynamic-therapy experiments using higher irradiances on monkeys with choroidal neovascularization. Dr. Miller's draft protocol initially proposed testing two irradiances, 300 mW/cm$^2$ and 600 mW/cm$^2$. QLT's Dr. Levy modified Dr. Miller's proposal and insisted that the protocol evaluate four different irradiance levels, including the 900 mW/cm$^2$ irradiance level.[3] Portions of the results of the 1993 experiments were reported in examples 3, 4, and 5 of the '303 patent.

### III. *Summary Judgment and Correction of Inventorship*

QLT brings its motion to correct inventorship in the form of a summary judgment motion. A district court shall grant a motion for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). Under District of Massachusetts Local Rule 56.1, a material fact is deemed admitted when the nonmoving party does not contest facts set forth in the moving party's statement

---

**3.** It appears that Dr. Levy also insisted that the protocol include the 150 mW/cm$^2$ irradiance level. Therefore, the revised protocol called for testing four irradiance levels: 150 mW/cm$^2$, 300 mW/cm$^2$, 600 mW/cm$^2$, and 900 mW/cm$^2$. Because this Memorandum

and Order concerns Dr. Levy's contribution to the upper end of the irradiance range, Dr. Levy's insertion of 150 mW/cm$^2$ into the protocol is not relevant for purposes of this decision.

of undisputed facts.[4] *Stonkus v. City of Brockton Sch. Dep't,* 322 F.3d 97, 102 (1st Cir.2003).

■ The first part of this memorandum explains that there are no genuine disputes of material fact because MEEI did not controvert paragraphs 115 and 120 of QLT's Statement of Undisputed Facts. The second part of this memorandum concludes that QLT is entitled to judgment as a matter of law. Having already set forth the applicable law for correction of inventorship in its November 23, 2004 Memorandum and Order, *see Massachusetts Eye and Ear Infirmary v. Novartis Ophthalmics, Inc.,* 345 F.Supp.2d 133 (D.Mass. 2004), the Court, at this stage, will only reiterate the general principle that joint inventors must prove their significant contribution to the conception of the invention. *Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir. 1998); *see Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed.Cir.1997). Because the Court rules as matter of law that QLT's Dr. Levy significantly contributed to the conception of the upper end of the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range claimed in the '303 patent, the Court grants in part QLT's motion to correct inventorship.

## IV. *Discussion*

### A. *No Genuine Dispute of Material Fact Exists Because MEEI Failed to Controvert Paragraphs 115 and 120 of QLT's Statement of Undisputed Facts*

QLT's Statement of Undisputed Facts and MEEI's response thereto unambiguously show that the parties do not dispute that QLT's Dr. Levy contributed to the conception of the upper end of the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range. Paragraphs 115 and 120 state that not only did Dr. Levy conceive of testing 900 mW/cm$^2$, but also that MEEI's Dr. Miller had not previously tested 900 mW/cm$^2$. MEEI did not controvert the facts contained in either paragraph, but it noted its dispute with QLT's characterization of those facts.

Paragraph 115 of QLT's Statement of Undisputed Facts states that "Levy insisted that the protocol evaluate four different irradiance levels, including 900 mW/cm$^2$." This paragraph is based on Dr. Levy's deposition testimony, in which she stated: "... we insisted that four different influence [sic] rates be run in the protocol that we submitted back to Joan Miller, and the fluence rates[5] went from I believe 200 to 900 milliwatts—or was it 300—300 to 900." MEEI did not controvert the fact that Dr. Levy insisted on testing 900 mW/cm$^2$. In its response to paragraph 115, it stated: "MEEI does not dispute the 'facts' set forth in ¶ 115." Nevertheless, MEEI noted its disagreement with QLT's "characterization" of those facts, essentially arguing that Dr. Miller's 1992 experiments rendered Dr. Levy's contribution insignificant. Because MEEI's "characterization" argument involves a legal issue—namely the significance of Dr. Levy's contribution—the Court addresses it in the next section.

Like paragraph 115, paragraph 120 sets forth facts material to the conception of

---

4. Specifically, Local Rule 56.1 states that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by the opposing parties unless controverted by the statement required to be served by opposing parties."

5. "Fluence rate" is another way of referring to "irradiance." "Fluence" is irradiance multiplied by the time of irradiance.

the upper end of the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range. Paragraph 120 provides:

> As of that same time [i.e., prior to Dr. Miller's 1993 agreement with QLT], Miller had not used or proposed to use an irradiance level of 900 mW/cm$^2$ to treat choroidal neovasculature or normal choroidal vessels using any form of BPD. [Dr. Miller] testified that "900 was not an important number."

This paragraph was based on Dr. Miller's deposition testimony in which she stated that during her 1992 experiments she did not specifically test 900 mW/cm$^2$ and that "900 was not an important number." As with paragraph 115, MEEI did not dispute the facts contained in paragraph 120, but again contested MEEI's characterization of those facts.

■ Before proceeding, the Court notes that paragraph 115, which summarizes Dr. Levy's own testimony that she insisted that Dr. Miller include 900 mW/cm$^2$ in the protocol, cannot, standing alone, serve as the basis for adding Dr. Levy as a co-inventor. *See Ethicon,* 135 F.3d at 1461. Instead, there must be some additional evidence corroborating a putative co-inventor's testimony regarding his or her contribution. *Id.* This corroboration requirement applies when, as here, the motion to correct inventorship is brought in the form of a summary judgment motion. *See Smart Parts, Inc. v. WDP Ltd.,* 2004 WL 1900411, *7 (D.Or. Aug.23, 2004) (evaluating sufficiency of corroborating evidence in granting summary judgment on motion to correct inventorship). Courts employ a "rule of reason" analysis to determine whether a putative inventor's testimony has been corroborated. *Ethicon,* 135 F.3d at 1461. In applying the "rule of reason" test, the Court must examine "all pertinent evidence," including contemporaneous documents and circumstantial evidence, to determine whether the putative co-inventor's story is credible. *Id.*

■ Applying the "rule of reason" analysis, the Court rules that there is sufficient evidence corroborating Dr. Levy's testimony that she conceived of the upper end of the claimed irradiance range. The most notable corroborating evidence is MEEI's admission that Dr. Levy insisted on testing 900 mW/cm$^2$. A similar situation occurred in *Sim Kar Lighting Fixture Co. v. Genlyte, Inc.,* 906 F.Supp. 967, 971–72 (D.N.J. 1995), in which the court denied the defendant patent owner's summary judgment motion on the putative inventor's claim for declaration of inventorship. In that case, the district court found sufficient corroboration in the patent owner's pretrial stipulation that labeled the putative inventor a "coinventor." [6] *Id.* at 969, 971. Likewise, MEEI admitted in its response to paragraph 115 that Dr. Levy insisted that Dr. Miller test 900 mW/cm$^2$. Because this admission is analogous to the pretrial stipulation in *Sim Kar,* the Court rules that it constitutes corroborating evidence.

In addition, other evidence corroborates Dr. Levy's testimony. For example, on July 7, 1993, QLT's director of clinical research, Dr. Vincent Salvatori, faxed a letter to Dr. Miller that stated in part: "In summary, we agreed to the following approach .... proposed [irradiances] are 150, 300, 600, 900 mW/cm$^2$." MEEI is quick to point out that this letter neither mentions Dr. Levy by name nor states that 900 mW/cm$^2$ was Dr. Levy's idea.

---

**6.** Although the court in *Sim Kar* indicated that it would not judicially estop the patent owner from subsequently making a contrary assertion, *Sim Kar,* 906 F.Supp. at 971–72, this Court, under Local Rule 56.1, must deem MEEI's response as an admission "for purposes of the motion."

Nevertheless, Dr. Miller testified in her deposition that her protocol "was reviewed and modified in part by QLT." And MGH's Dr. Hasan further explained that both Dr. Levy and Dr. Salvatori were responsible for modifying Dr. Miller's protocol.[7] Taken together, all of this pertinent evidence serves as corroboration for Dr. Levy's testimony that she conceived of the 900 mW/cm$^2$ irradiance level.

Based on the foregoing, the Court rules that summary judgment is the appropriate vehicle for resolving the inventorship issue because there are no genuine disputes of material fact. MEEI controverted neither Dr. Levy's testimony that she insisted on including 900 mW/cm$^2$ in the protocol nor Dr. Miller's testimony that she had not specifically tested 900 mW/cm$^2$ prior to that time.

**B. *QLT Is Entitled to Judgment as a Matter of Law Because Dr. Levy Significantly Contributed to the Conception of the Upper End of the Irradiance Range Claimed in the '303 Patent***

■ The Court next concludes that QLT is entitled to judgment as a matter of law because Dr. Levy significantly contributed to the conception of the upper end of the irradiance range claimed in the '303 patent. "Patent issuance creates a presumption that the named inventors are the true and only inventors." *Ethicon*, 135 F.3d at 1460. Thus, to prove joint invention, "each joint inventor must generally contribute to the conception of the invention." *Id.* Conception is defined as the " 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.' " *Id.* (quoting *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986)). Moreover, "a co-inventor need not make a contribution to every claim of a patent." *Id.* Instead, "the critical question for joint conception is who conceived, as that term is used in the patent law, the subject matter of the claims at issue." *Id.* Here, although Dr. Miller and Dr. Gragoudas are presumed co-inventors of the '303 patent, the Court rules that the undisputed facts clearly and convincingly show that Dr. Levy conceived of the upper end of the irradiance range because: Dr. Levy insisted that Dr. Miller test 900 mW/cm$^2$; Dr. Miller had never tested 900 mW/cm$^2$ before collaborating with QLT; 900 mW/cm$^2$ became the upper end of the irradiance range claimed in independent claims 1 and 9 of the '303 patent; and 900 mW/cm$^2$ is the highest irradiance level at which a practitioner may safely administer photodynamic therapy in the manner claimed by the '303 patent.

Despite these facts, MEEI insists that Dr. Levy made no significant contribution to the '303 patent. In disputing QLT's characterization of the facts contained in paragraphs 115 and 120, MEEI claims that Dr. Miller conceived of the idea of using higher irradiances in the Fall of 1992, which was before her collaboration with QLT. To this end, MEEI details Dr. Miller's first set of 1992 experiments in which she performed photodynamic therapy on monkeys with normal choroidal ves-

---

7. In her deposition, Dr. Hasan testified:

The pre-clinical pharmacology study, as it's titled, was that Vince Salvatore [sic] from QLT was the connecting agent for QLT, and at this end Joan Miller and I would write up a protocol that would be sent to Vince. Julia [Levy] and Vince would look at it is my understanding, but Julia would—if she had a comment, she would talk on the phone about that, and they would come back with the reorganized protocol. So the monkey protocols as they were written had QLT, Mass. Eye and Ear and the Mass. General involvement in them.

sels using shortened treatment times and specific irradiances of 300 mW/cm$^2$, 600 mW/cm$^2$, 1200 mW/cm$^2$, and 1800 mW/cm$^2$. MEEI then points out that 900 mW/cm$^2$ falls within the range of irradiances tested in 1992 and asserts that Dr. Miller "concluded on the basis of those experiments that irradiances up to 1200 mW/cm$^2$ were effective in treating [choroidal neovascularization] without collateral damage, nearly a year before the design of the [1993 collaboration with QLT]."

This argument, however, cannot withstand close scrutiny for three reasons: (1) the first set of 1992 experiments failed to specifically test 900 mW/cm$^2$, the upper end of the range claimed in the '303 patent; (2) the first set of 1992 experiments involved monkeys with normal choroidal vessels and, therefore, could not demonstrate closure of choroidal neovasculature, the subject of the '303 patent; and (3) the higher irradiances used in the first set of experiments, namely, 1200 mW/cm$^2$ and 1800 mW/cm$^2$, were unsuccessful.

First, the Court rejects MEEI's contention that Dr. Miller conceived of the upper end of the irradiance range because she tested irradiances that were both greater and less than 900 mW/cm$^2$. Given that 900 mW/cm$^2$ is the upper end of the irradiance range claimed in the '303 patent, the critical inquiry is whether Dr. Miller or Dr. Levy conceived of this specific figure. It is undisputed, however, that Dr. Miller did not specifically test an irradiance of 900 mW/cm$^2$ in her 1992 experiments. Although she tested 300 mW/cm$^2$, 600 mW/cm$^2$, 1200 mW/cm$^2$, and 1800 mW/cm$^2$, she testified in her deposition that she never tested 900 mW/cm$^2$. Furthermore, even though 900 mW/cm$^2$ is the upper end of the irradiance range claimed in the '303 patent, Dr. Miller testified that "900 was not an important number." Therefore, the fact that Dr. Miller had previously tested irradiances that were both greater and less than 900 mW/cm$^2$ is irrelevant to the issue of which party conceived of the upper end of the of 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range.

The Court's conclusion about the irrelevance of the 1992 experiments is supported by MEEI's own patent-law expert, who testified that when determining conception of a range it is necessary to discern which putative co-inventor conceived of the end or ends of the range. Thus, to take an example from the patent-law expert's deposition, a proposed experiment to test 200 mW/cm$^2$, 250 mW/cm$^2$, 300 mW/cm$^2$, and 600 mW/cm$^2$ could not serve as the basis for conception of a range of 300 mW/cm$^2$ to 900 mW/cm$^2$ because the experiment had not specifically tested 900 mW/cm$^2$. But if the proposed experiment had specifically tested 900 mW/cm$^2$, then it could serve as the basis for conception of the 300 mW/cm$^2$ to 900 mW/cm$^2$ range. This is true, according to MEEI's patent-law expert, even if the researchers were initially unsure about whether any of these irradiances would cause thermal damage to the retina. Here, MEEI admits that Dr. Miller never tested 900 mW/cm$^2$ before Dr. Levy insisted on its inclusion. Thus, MEEI's argument that Dr. Levy's 900 mW/cm$^2$ suggestion was insignificant flies in the face of its own patent-law expert's testimony that to conceive of a 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range an inventor must actually test 900 mW/cm$^2$.

In addition, 900 mW/cm$^2$ is the highest irradiance level at which a practitioner may safely administer photodynamic therapy in the manner claimed by the '303 patent. As described above, the '303 patent is inventive over the '349 patent only because it claims a shortened treatment time by using higher irradiances. At oral argument, counsel for the parties indicated that treatment times would decease as ir-

radiance increased, but too much of an irradiance increase would result in thermal damage to the retina. Therefore, 900 mW/cm$^2$ is a critical figure because it represents the highest irradiance that may safely be used under the method claimed in the '303 patent. The fact that Dr. Levy directed Dr. Miller to test the figure that ultimately became the upper end of the irradiance range shows not only that Dr. Levy conceived of the 900 mW/cm$^2$ irradiance level, but also that Dr. Levy's contribution to the upper end of the irradiance range was critical to the invention claimed by the '303 patent.

MEEI's argument would be more forceful if the '303 patent claimed a range in which the upper end had actually been tested by Dr. Miller in 1992. For example, if the range claimed in the '303 patent were 300 mW/cm$^2$ to 1200 mW/cm$^2$, the latter having been tested in 1992 by Dr. Miller, then Dr. Levy's insistence on testing 900 mW/cm$^2$ might very well have been less significant. But given that 900 mW/cm$^2$ is the upper end of the range claimed in the '303 patent, and given that thermal damage may result at higher irradiances, Dr. Levy's directive to specifically test 900 mW/cm$^2$ shows she significantly contributed to the conception of the upper end of the range claimed in the '303 patent. Therefore, the Court rules that although Dr. Miller tested irradiances that were both greater and less than 900 mW/cm$^2$ in 1992, these earlier experiments in no way decreased the significance of Dr. Levy's insisting that 900 mW/cm$^2$ be included in the 1993 protocol.

Second, although the '303 patent claims closure of choroidal neovasculature, Dr. Miller conducted her first set of 1992 experiments on monkeys with normal choroi-dal vessels. It was not until Dr. Miller's 1993 collaboration with QLT that she performed higher irradiance experiments on monkeys with choroidal neovascularization.[8] Thus, Dr. Levy's insistence on testing 900 mW/cm$^2$ on monkeys with choroidal neovascularization might very well have been a significant contribution, even if, *arguendo*, Dr. Miller had previously tested 900 mW/cm$^2$ on monkeys with normal choroidal vessels. In other words, had Dr. Miller specifically tested 900 mW/cm$^2$ in 1992 on monkeys with normal choroidal vessels, the Court would still be hesitant in labeling Dr. Levy's contribution as insignificant.

Third, the first set of 1992 experiments using the higher irradiances of 1200 mW/cm$^2$ and 1800 mW/cm$^2$ on monkeys with normal choroidal vessels were unsuccessful, and the problems resulting from these higher irradiances caused Dr. Miller to avoid testing irradiances greater than 600 mW/cm$^2$ in her second set of 1992 experiments. According to Dr. Miller: "We wanted to look at a higher [irradiance] range and look until we saw something toxic. In the first set of [1992] experiments we saw some damage at 1200 and 1800." Due to the damage caused by these higher irradiances, Dr. Miller avoided testing irradiances greater than 600 mW/cm$^2$ when she conducted the second set of 1992 experiments on monkeys with choroidal neovascularization. When testifying about these subsequent experiments, Dr. Miller explained that "the 600 was four times higher than what we'd been working at, and that seemed high enough." Moreover, the abstract that described these experiments only reported the tests using a low irradiance level of 150 mW/cm$^2$. Because the experiments using 1200 mW/cm$^2$

8. As explained at various points in this memorandum, Dr. Miller conducted a second set of experiments in 1992 on monkeys with choroi-dal neovascularization, but these experiments involved lower irradiances, i.e., irradiances less than 600 mW/cm$^2$

and 1800 mW/cm$^2$ were unsuccessful, and because Dr. Miller testified that 600 mW/cm$^2$ was "high enough," it is difficult for the Court to conclude that Dr. Levy's insistence on testing 900 mW/cm$^2$ was anything but a significant contribution to the conception of the upper end of the irradiance range.

Lastly, the Court rejects MEEI's final argument that Dr. Levy made no significant contribution to the upper end of the irradiance range because Dr. Miller told the patent lawyer to include the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range in the application that issued as the '303 patent. Given that MEEI admits that Dr. Miller tested 900 mW/cm$^2$ only at Dr. Levy's insistence in 1993, it hardly seems plausible that only Dr. Miller, and not Dr. Levy, appreciated the significance of the 900 mW/cm$^2$ irradiance level, especially in light of Dr. Miller's testimony that "900 was not an important number." Furthermore, the test for inventive contribution does not turn on which person instructed the patent attorney on how to draft the patent application. If Dr. Levy conceived of the upper end of the claimed irradiance range—and all the evidence indicates that she did—then it is of no consequence which party told the patent attorney to describe the 300 mW/cm$^2$ to 900 mW/cm$^2$ range in the application.

### V. *Conclusion*

Based on the undisputed facts, the Court rules as a matter of law that Dr. Levy significantly contributed to the conception of the upper end of the irradiance range claimed in the '303 patent. As such, the Court orders that the '303 patent be corrected to include QLT's Dr. Levy as a joint inventor.

The Court grants in part the Joint Motion of Massachusetts General Hospital and QLT to Correct Inventorship of the '303 Patent. The Court hereby orders that the '303 patent be corrected to add QLT's Dr. Julia Levy as a co-inventor because she significantly contributed to the conception of the upper end of the 300 mW/cm$^2$ to 900 mW/cm$^2$ irradiance range set forth in independent claims 1 and 9 of said patent.

SO ORDERED.